UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTOPHER MATUSAK,

                             Plaintiff,                    DECISION & ORDER

                                                          21-CV-6058MWP
               v.

DEPUTY MATTHEW DAMINSKI, et al.,

                             Defendants.
_____


## PRELIMINARY STATEMENT

Plaintiff Christopher Matusak commenced this action on January 22, 2021, against three Monroe County Sherriff's Office ("MCSO") employees, Deputy Matthew Daminski, Deputy Stephen Murphy, and Sergeant Brian Unterborn (collectively, "defendants"), asserting claims for excessive force under 42 U.S.C. § 1983 in connection with Matusak's February 1, 2018 arrest.  (Docket # 1).  On February 9, 2022, the parties consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c).  (Docket # 14).

Following a five-day trial, the jury returned a verdict in favor of Daminski but found that Murphy and Unterborn were liable for using excessive force in violation of Section 1983.  (Docket # 67).  Murphy and Unterborn have moved for judgment in their favor on the grounds of qualified immunity.  (Docket # 77).  Also pending is Matusak's motion for pre-judgment and post-judgment interest.  (Docket # 79).  For the reasons discussed below, defendants' motions are granted, and Matusak's motion is denied as moot.

**FACTUAL BACKGROUND**

This lawsuit arises out of the February 1, 2018 arrest of Matusak following a traffic stop of the car he was driving and his flight on foot from the scene of the stop.  Matusak and each of the defendants testified at trial.  Although the parties' versions of events conflicted in several meaningful respects, the undisputed evidence established that defendants used force against Matusak after he led Daminski on a foot chase through a wooded area behind a residential area.  In relevant part, the evidence demonstrated that during the chase a physical altercation took place between Daminski and Matusak, during which Daminski struck Matusak's face and deployed two bursts of pepper spray.  Eventually, Murphy and Unterborn arrived at the scene.  Murphy delivered two fist strikes and two knee strikes to Matusak's torso, and Unterborn deployed a taser to Matusak's back.  The officers then handcuffed Matusak, and he received treatment from medical personnel who had been dispatched to the scene.

I.     **Summary of Evidence**

A.     **Matusak's Testimony**

Matusak testified that the encounter began after he noticed a police vehicle following him while he was driving during the early-morning hours of February 1, 2018. (Tr. 59-60).[1]  At that time, he was 35 years old, weighed approximately 230 pounds, and had been a college wrestler, winning state titles twice in high school.  (Tr. 45-46, 85-87, 181). Matusak admitted that he had been drinking while driving and that he had an open container in his vehicle.  (Tr. 61, 169).  Matusak parked and exited his vehicle, saw the police vehicle activate

---

[1]  The trial transcript shall be referred to as "Tr." (Docket ## 72, 73, 74, 75, 76).

its emergency lights, and ran between two houses towards a wooded area behind the houses. (Tr. 62, 169-70). The ground was covered in snow. (Tr. 63). Matusak testified that he ran to avoid being arrested for driving while intoxicated. (Tr. 61).

Matusak testified that after running for approximately thirty yards he encountered a fence or other "enclosure" blocking his path. (Tr. 65, 172-73). Sensing that Daminski was "right behind" him, Matusak raised his hands in the air and turned around to face the approaching deputy. (Tr. 65-66, 174-75). According to Matusak, at that point Daminski used his fist to strike Matusak's left eye, causing Matusak to fall to the ground in significant pain. (Tr. 65-66, 174-75). Matusak remained on the ground in the fetal position, attempting to protect his face from further blows. (Tr. 66-68). Matusak testified that Daminski punched, kneed, and kicked him, and sprayed pepper spray in his face. (Tr. 67-68). Matusak testified that he was "in and out of consciousness" and that he did not attempt to hit or strike Daminski. (Tr. 67-68, 188-89). After approximately three or four minutes, another officer arrived on scene, and both that officer and Daminski continued to deliver blows to Matusak's body, including his face, torso, and back. (Tr. 69, 75). A third officer arrived and deployed a taser against Matusak, who was then placed in handcuffs and carried to an ambulance. (Tr. 175). Matusak estimated that the entire encounter lasted approximately twenty minutes and that he was struck at least thirty times. (Tr. 69, 75). He stated that he never tried to strike or otherwise fight the deputies. (Tr. 75-76, 188-89).

Matusak testified that he suffered resulting physical and emotional damages. Specifically, he suffered a fractured left orbital bone, a broken nose and nasal cavity, a facial laceration requiring stitches, bruising to both eyes, a swollen face and lips, lacerations and bruising where the taser prongs entered his back, and bruising and scratches on his arms, back,

3

and the sides of his torso.  (Tr. 90, 98, 99, 102, 104, 105, 118).  Matusak testified that he also

suffered emotional injuries, including depression, anxiety, nightmares, and insomnia.  (Tr. 119,

127).


  **B.**  <u>**Daminski's Testimony**</u>

    Daminski was hired by the MCSO in February 2013 and was working as a Deputy

Sheriff on road patrol on the night of the incident.  (Tr. 210).  Daminski testified that he was

parked in his patrol vehicle in a parking lot during the early-morning hours of February 1, 2018,

when he observed a vehicle drive past him.  (Tr. 330).  Daminski called dispatch to check the

license plate number of the vehicle and pulled onto the roadway to continue his investigation of

the vehicle.  (Tr. 330-31).  He momentarily lost sight of the vehicle but observed it a few

moments later traveling at "a very high rate of speed."  (Tr. 332).  At that point, Daminski

decided to conduct a traffic stop of the vehicle.  (Tr. 217, 332).

    As he was following the vehicle, Daminski observed the driver's side door of the

vehicle start to open, and he then activated his emergency lights.  (Tr. 217).  After doing so,

Daminski observed Matusak exit the vehicle and run towards a thinly-wooded area behind two

residential houses.  (Tr. 218, 236).  Daminski exited his vehicle and ran after Matusak.  (Tr. 227).

The foot chase covered approximately a quarter of a mile and lasted approximately four minutes.

(Tr. 236-37).  As he pursued Matusak, Daminski used his radio to broadcast his location to other

law enforcement officers.  (Tr. 300-301; *see also* Docket # 82-7).  At approximately 1:19 a.m.,

Daminski tackled Matusak from behind while Matusak was still running.  (Tr. 236-37, 314).

According to Daminski, there was no fence or other enclosure in the vicinity.  (Tr. 321).

Daminski testified that he landed on top of Matusak, but that Matusak, who was stronger and heavier by about 65 pounds than Daminski, almost immediately maneuvered himself on top of Daminski. (Tr. 215, 244-45, 347). Matusak straddled Daminski, pinned Daminski's right shoulder to the ground, and repeatedly pounded on Daminski's chest with his right fist. (Tr. 245-46, 315). According to Daminski, he was not injured because he was wearing a protective chest plate. (Tr. 246-47). Daminski testified that he believed he was in danger at that time because he was not in control and Matusak was in a position from which he could reach Daminski's gun or injure Daminski's face or neck. (Tr. 316). Daminski testified that he successfully distracted Matusak by delivering three or four strikes to Matusak's head using his right hand. (Tr. 247-48). Matusak rolled off of Daminski. (Tr. 251-53, 255). From their roughly parallel prone positions on the ground, Matusak and Daminski grappled with each other, and Daminski delivered a knee strike to the area of Matusak's nose and left eye (Tr. 252-55, 268), which Daminski believes resulted in the fracture of Matusak's orbital bone.

After the knee strike, Matusak shifted to his hands and knees, while Daminski gained a position of "dominance" by straddling Matusak at his waistline. (Tr. 257-58). From that position, Daminski used his radio to provide an update concerning his location. (Tr. 301; Docket # 82-7). Matusak did not attempt to strike Daminski again, although he continued to struggle by using his hands and knees to push his body in an attempt to dislodge Daminski from his back. (Tr. 258-61). After assessing the situation, Daminski deployed a burst of pepper spray to Matusak's face, which caused Matusak to stop pushing and to drop to his hands and knees. (Tr. 261). Daminski radioed for an ambulance. (Tr. 311-12; Docket # 82-7). Daminski testified that it is standard practice to request an ambulance whenever pepper spray is used so that medical personnel may perform an eye flush. (Tr. 312).

5

After approximately twenty seconds, Matusak once again tried to push himself up. (Tr. 261-62). Daminski responded by punching the right side of Matusak's face two times. (Tr. 262-63). After the strikes, Matusak momentarily ceased attempting to raise his body, but again attempted to rise, prompting Daminski to spray another burst of pepper spray to Matusak's face. (Tr. 263-64, 266-67). At that point, Matusak collapsed on the ground and clasped his hands under his body. (Tr. 266, 267).

At about this time, Murphy and Unterborn arrived at the scene to assist Daminski. (Tr. 241, 267-68). Daminski shifted his position to Matusak's left side and attempted to gain control of his left arm for handcuffing while Murphy attempted to gain control of Matusak's right arm. (Tr. 269-75). Daminski testified that he thought that Murphy had used a knee strike to obtain Matusak's compliance, but was not certain whether Murphy had used any fist strikes. (*Id.*). Unterborn deployed his taser, at which point Matusak went limp and he was placed into handcuffs. (Tr. 275, 334-35).

Daminski testified that each time he used force against Matusak he assessed the situation to determine whether and the extent to which his force had succeeded in obtaining Matusak's compliance. (Tr. 324). Daminski considered several factors in evaluating the force to use against Matusak, including that: he was alone in the woods and was not certain whether and when backup would arrive to assist (Tr. 327-28, 347-48); Matusak was stronger and heavier than he was (Tr. 327-29, 345, 437); he was becoming fatigued after the chase and ensuing struggle (Tr. 328); he smelled alcohol emanating from Matusak (Tr. 328-29); and, although he did not observe anything to indicate that Matusak possessed a weapon, he could not be certain that Matusak was unarmed. (Tr. 234-35).

C.     **Murphy's Testimony**

Murphy testified that on February 1, 2018, he was employed as an MCSO Deputy.  (Tr. 377).  During his early-morning shift, Murphy overheard Daminski's radio transmission that he was engaged in a foot pursuit.  (Tr. 379).  Murphy got into his patrol vehicle, activated its emergency lights, and began driving to Daminski's location.  (Tr. 379).  As he was driving, Murphy continued to hear Daminski's transmissions.  (Tr. 379-80).  According to Murphy, Daminski sounded like he was running and was out of breath and "under stress." (Tr. 380).  Murphy testified that there were periods of radio silence, during which other officers prompted Daminski to "keep talking."  (Tr. 380-81).  Daminski periodically responded but at some point stopped communicating, despite prompts requesting an update from him. (Tr. 380-81).  Daminski's failure to communicate despite these prompts caused Murphy "significant concern."  (Tr. 380-81).  After that period of silence, Murphy heard Daminski say "fighting in the woods."  (Tr. 372-73; Docket # 82-7).  He also heard Daminski utter, "Knock it off."  (Tr. 373).  Based upon these radio transmissions, Murphy assumed that Daminski and Murphy had been or continued to be engaged in a physical altercation.  (Tr. 370-71).

Murphy arrived at Daminski's location about six minutes after hearing Daminski's report of the foot chase.  (Tr. 381). When he arrived, he observed Matusak on the ground on his hands and knees, attempting to push himself up, while Daminski was straddling Matusak with his arms outstretched in an attempt to keep Matusak from getting to his feet. (Tr. 383-84).  He did not know whether Matusak possessed any weapons.  (Tr. 370-71, 388).

Daminski yelled, "I'm over here," and Murphy ran to assist Daminski. (Tr. 382-83).  As Murphy approached, he instructed Matusak to "stop resisting," and Matusak shifted his position by lying prone on the ground with his hands clasped underneath his body.

7

(Tr. 384-85). Murphy approached Matusak's right side, reached his hand under Matusak's body, and attempted unsuccessfully to pull out Matusak's hand. (Tr. 367-68, 384-85). Murphy instructed Matusak to "give [him] his arm." (Tr. 384-85). When Matusak failed to comply within a few seconds of the command, Murphy delivered two fist strikes to Matusak's abdomen. (Tr. 366-67, 385).

According to Murphy, he attempted once more to gain control of Matusak's arm. (Tr. 366, 385). Again, Murphy reached under Matusak's body and tried to pull out his arm. (Tr. 366, 385). According to Murphy, Matusak had not changed his grasp or released any tension in his arm. (Tr. 385). Unable to pull out Matusak's arm, Murphy again directed Matusak to "give [him] his arm." (Tr. 385). When Matusak failed to comply within "a span of seconds," Murphy delivered two knee strikes to Matusak's abdomen. (Tr. 368, 385).

After delivering the knee strikes, Murphy reached under Matusak's body to grab his arm and pull it out. (Tr. 387). According to Murphy, although Matusak was "very strong" and still exhibited considerable arm tension, his grasp had loosened, and Murphy was beginning to make progress in pulling Matusak's arm from underneath him but "did not have complete control over it." (Tr. 387). As he continued to struggle with Matusak's arm, Unterborn provided a verbal command with which Matusak failed to comply. (Tr. 387-88). Unterborn then deployed his taser, and Murphy gained control of Matusak's arm and placed him in handcuffs. (Tr. 388). Murphy testified that the only strikes he used were the two fist strikes and two knee strikes. (Tr. 389). According to Murphy, after he and Unterborn arrived on scene, it took less than a minute to handcuff Matusak. (Tr. 365-67).

D.    **Unterborn's Testimony**

Unterborn testified that on February 1, 2018, he was employed by the MCSO as a Deputy Sheriff with the rank of Sergeant.  (Tr. 480-81).  At approximately 1:15 a.m., he heard Daminski report over the dispatch radio that he was investigating a suspicious vehicle.  (Tr. 483).  Shortly thereafter, he heard Daminski report that he was engaged in a foot pursuit.  (Tr. 483).  Unterborn decided to respond to Daminski's reported location to provide backup.  (Tr. 483).  As he was driving, he heard Daminski periodically report his location over the radio.  (Tr. 483-84).  He then heard what sounded like a physical struggle, after which Daminski stopped providing updates, despite prompts from several deputies to provide them.  (Tr. 484).  Eventually, Daminski provided an update.  (Tr. 484).  According to Unterborn, Daminski sounded "extremely winded" and tired.  (Tr. 484).

Unterborn testified that when he arrived on scene he observed Matusak "grappling" with Daminski.  (Tr. 441-43, 478).  Specifically, he recounted that he saw Matusak flailing his arms and attempting to rise to a standing position from his knees.  (Tr. 431, 436, 478, 486).  Unterborn testified that "grappling" refers to a physical struggle without strikes, which he classifies as a form of "active aggression."  (Tr. 432-33, 441-43, 478).  As Unterborn approached, Matusak shifted into a prone position with his hands clasped underneath his body, and both Murphy and Daminski were trying to obtain control of Matusak's arms in order to handcuff him.  (Tr. 437-39, 445-46).

Unterborn kneeled on the ground behind Matusak, and he heard both Murphy and Daminski direct Matusak to place his hands behind his back.  (Tr. 440).  Unterborn testified that he was focused on Matusak and did not observe Murphy deliver any strikes.  (Tr. 446, 448).  Matusak did not comply with Murphy's and Daminski's verbal commands.  (Tr. 449).

Unterborn testified that Matusak engaged in "passive resistance" when he failed to place his hands behind his back and "defensive resistance" when he flailed his arms to prevent the officers from handcuffing him. (Tr. 430-31).

Unterborn directed Matusak to place his hands behind his back and waited approximately five or ten seconds to see if Matusak would comply. (Tr. 440, 450-51). When he did not, Unterborn deployed a five-second taser cycle to the area of Matusak's upper back. (Tr. 450-52, 455). Two probes entered Matusak's upper back and, as the taser cycled, Unterborn placed the front of the taser towards Matusak's lower back in order to create a "broader connection" and achieve neuromuscular incapacitation. (Tr. 456, 487). After he deployed the taser, the deputies were able to secure Matusak in handcuffs. (Tr. 488).

Unterborn testified that he was trained to deploy his taser only when confronted with active aggression. (Tr. 479). According to Unterborn, it would be inappropriate to deploy a taser in order to overcome defensive or passive resistance. (Tr. 479). Unterborn explained that as he approached the scene he observed Matusak engaged in active aggression against Daminski and that he deployed the taser after Matusak refused to comply with commands in order to take him into custody and prevent him from again becoming aggressive. (Tr. 441, 451-52). Unterborn also testified that he believed use of a taser would pose less of a risk of injury to Matusak than other applications of force, such as use of a baton. (Tr. 487-88).

### E.    Rathfelder's Testimony and the Parties' Stipulation

Eric Rathfelder, a part-time paramedic and full-time officer with the Rochester Police Department, testified that on the morning of February 1, 2018, he was working as a paramedic and was dispatched to the area of Browns Road and Robert Quigley Drive.

10

(Tr. 515-16, 519).  He arrived at the scene at approximately 1:30 a.m. and encountered Matusak and the defendants.  (Tr. 519-20, 542).  He treated Matusak and transported him to Strong Memorial Hospital.  (Tr. 520, 534-35).

Rathfelder testified that his observations of Matusak led him to believe that Matusak was intoxicated.  (Tr. 520).  Those observations included watery, bloodshot eyes, inappropriately loud, repetitive, and nonsensical speech, and a strong odor of alcohol.  (*Id.*).

A stipulation of facts was read into evidence.  According to the stipulation, the parties agreed that Matusak was intoxicated when he was operating his vehicle "immediately before he was pulled over" by Daminski; was intoxicated "when he left his vehicle and ran towards the woods in an attempt to flee" from Daminski; and, was intoxicated "when he was apprehended by [Daminski] and when [d]efendants used force during the arrest of Matusak." (Docket # 48; Tr. 545-46).

F.    **Dispatch Transmissions**

The recording of the dispatch communications during and relating to the incident was admitted into evidence and played for the jury.  (Tr. 74).  The exhibit contained only the actual transmissions and did not include the periods of "dead air" during which no communications occurred.  (Tr. 485).  Thus, although the entire incident lasted approximately twenty minutes, the exhibit introduced into evidence contains approximately eight minutes of transmissions.  (Docket # 82-7).

The recording contains Daminski's dispatches relating to Matusak's vehicle, his chase of Matusak, and his locations.  (*Id.*).  On several occasions, other voices were recorded

urging Daminski to "keep talking." (*Id.*). Towards the end of the recording, Daminski requests an ambulance for the suspect.


II.    <u>**Jury Verdict and Special Interrogatories**</u>

After Matusak rested and again after the close of proof, Murphy and Unterborn moved for judgment as a matter of law on the basis of qualified immunity. (Tr. 505, 547). The Court reserved on their motions. (Tr. 508, 547).

The jury was provided with a verdict form on which to record its verdict. (Docket # 67). The jury found that Matusak had not established that Daminski had subjected him to excessive force during his arrest. (*Id.* at 1). With respect to Murphy and Unterborn, by contrast, the jury found that they had subjected Matusak to excessive force in violation of the Fourth Amendment. (*Id.*). The jury awarded Matusak compensatory damages of $200,000, but no punitive damages. (*Id.* at 3, 6-7).

After the verdict was returned, in accordance with the procedure set forth in *Stephenson v. Doe*, 332 F.3d 68, 80-81 (2d Cir. 2003), and with input from the parties, the jury was directed to deliberate upon and answer a set of written special interrogatories (the "Special Interrogatories"). (Docket # 69). As discussed at length with the parties (Tr. 398-400, 599-604, 724-30), the questions posed to the jurors were prepared based upon the guidance provided by the Second Circuit in *Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020).

As reflected in the responses to the Special Interrogatories, the jury found that, as they approached the scene, Murphy observed Matusak attempting to push himself up from the ground, but that Unterborn did not observe Matusak flailing his arms or grappling with Daminski. (Docket # 69 at ¶¶ 2, 13, 14). In addition, the jury found that before Murphy or

Unterborn deployed any force Matusak was positioned face down on the ground with his hands underneath his body.  (*Id.* at ¶¶ 3, 15).

   With respect to Murphy, the jury determined that he did not hear Daminski say the phrase "fighting in the woods" over the dispatch radio but reasonably believed that he had. (*Id.* at ¶ 1).  The jury found that Murphy directed Matusak to stop resisting but did not provide Matusak sufficient time to comply with his directions before deploying force.  (*Id.* at ¶¶ 4, 5).  In addition, the jury found that Matusak was resisting Murphy's attempts to pull out his arm when Murphy delivered two fist strikes to Matusak's abdomen, and, although Matusak did not actually pose a threat to officer safety at that time, Murphy reasonably believed that he did.  (*Id.* at ¶¶ 6, 7).

   The jury further determined that after delivering the fist strikes Murphy verbally directed Matusak to give him his arm but did not provide Matusak sufficient time to comply with that direction before deploying additional force.  (*Id.* at ¶¶ 8, 9).  The jury found that Matusak was resisting Murphy's attempts to pull out his arm when Murphy delivered two knee strikes to Matusak's abdomen, and, although Matusak did not actually pose a threat to officer safety at that time, Murphy reasonably believed that he did.  (*Id.* at ¶¶ 10, 11).  Finally, the jury determined that, other than the two fist strikes and two knee strikes, Murphy did not deliver any additional strikes or kicks to Matusak.  (*Id.* at ¶ 12).

   With respect to Unterborn, the jury found that he did not observe any of the strikes to Matusak delivered by Murphy and that Unterborn directed Matusak to place his hands behind his back prior to deploying the taser.  (*Id.* at ¶¶ 16-18).  The jury found that Matusak did not comply with Unterborn's direction, but that Unterborn did not provide Matusak sufficient time to comply prior to deploying the taser.  (*Id.* at ¶¶ 19-20).  In addition, the jury determined

that Matusak was resisting the deputies' attempts to pull out his arms at the time Unterborn deployed the taser, and, although Matusak did not actually pose a threat to officer safety at that time, Unterborn reasonably believed that he did.  (*Id.* at ¶¶ 21-22).  Finally, the jury determined that during the encounter Unterborn did not deliver any strikes or kicks to Matusak.  (*Id.* at ¶ 23).

## DISCUSSION

Murphy and Unterborn move for judgment as a matter of law on the grounds of qualified immunity.  (Docket # 77).  They argue that a reasonable officer could have concluded that the force they used was lawful based upon the facts – found by the jury – that, at the time they deployed force, Matusak was resisting attempts to control his arms and they reasonably believed that he posed a threat to officer safety.  (Docket # 77-2).  Matusak opposes the motion, contending that clearly established law required the deputies to warn him and give him a reasonable time to comply prior to deploying the force that they did.  (Docket # 82-8).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The protection "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam)).  Thus, the doctrine "protects actions in the hazy border between excessive and acceptable force."  *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (per curiam) (internal quotations omitted).

14

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (internal quotations omitted). Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. at 231 (internal quotations omitted). The inquiry "is not whether the officer *should have* acted as he did[;] [n]or is it whether a singular, hypothetical entity exemplifying the 'reasonable officer' *would have* acted in the same way." *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 70 (2d Cir. 2018) (quotation and ellipses omitted). Rather, "[a]n officer is entitled to qualified immunity if '*any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful.'" *Id.* (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)). Thus, the relevant inquiry is whether "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (internal quotations omitted).

In determining whether a defendant is entitled to qualified immunity, courts must evaluate (1) whether the facts establish that the defendant violated plaintiff's constitutional rights and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Where, as here, the existence of a constitutional violation is established by a jury verdict imposing liability against defendants for use of excessive force, the remaining task "is to determine whether the right at issue was clearly established – that is, whether it was objectively reasonable for [defendants] to believe [their] acts did not violate those rights." *Jones v. Treubig*, 963 F.3d 21 at 225 (internal quotations omitted).

15

The question whether a right is clearly established turns on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. at 202.  In other words, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. at 11 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Thus, qualified immunity provides a broad shield for "all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Where, as here, a defendant seeks judgment on the grounds of qualified immunity after a jury verdict, the Court is required to view all disputed facts in the light most favorable to the plaintiff, the prevailing party.[2]  *See Jones*, 963 F.3d at 224 ("in the context of a Rule 50(a) motion, we must consider the evidence in the light most favorable to the party against whom the motion was made and … give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence") (internal quotations omitted); *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (Rule 50 motion after a trial may be granted only if the evidence, when viewed in the light most favorable to prevailing party, would have compelled a reasonable juror to find in favor of movant), *cert. denied*, 565 U.S. 1259 (2012); *Zellner v. Summerlin*, 494 F.3d 34 at 371 ("[t]he court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury[;] . . . [n]or is the court permitted to make findings on factual questions not submitted to the jury where those findings take the evidence in the light

---

[2] Of course, when evaluating the evidence in the light most favorable to the nonmovant, the Court cannot infer "facts that are inconsistent with the jury's findings."  *Pierce v. City of New York*, 293 F. Supp. 3d 306, 312 (E.D.N.Y. 2017) (citing *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("[t]he court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury")), *aff'd*, 805 F. App'x 70 (2d Cir. 2020).  Thus, in construing the evidence and drawing reasonable inferences, the Court may not do so in a manner that conflicts with the jury's verdict in favor of Daminski.

most favorable to the moving party, rather than the opposing party").  Considering the jury's factual findings and viewing all other disputed facts in a light most favorable to Matusak, I conclude, for the reasons explained below, that Murphy and Unterborn are entitled to qualified immunity.

Matusak argues that Unterborn and Murphy are not entitled to qualified immunity because it was clearly established at the time of Matusak's arrest that it was unreasonable to deploy significant force against a non-threatening individual who was no longer fleeing and only passively resisting arrest without first warning the individual and providing him sufficient time to comply.  (Docket # 82-8 at 7-14).  According to Matusak, the jury found that he was no longer "actively resisting" arrest at the time the force was deployed, and thus the officers should not have used the force they did without first issuing a warning and giving him an adequate amount of time to comply.  (*Id.*).

Unterborn and Murphy counter that their use of force was consistent with clearly established law that permitted the use of significant force against an individual who was resisting arrest and posing a risk to officer safety.  (Docket # 77-2 at 9-11).  Their argument rests principally on two of the jury's findings:  at the time the force was deployed (1) Matusak was resisting the defendants' attempts to pull out his arms and (2) they reasonably believed that he posed a threat to officer safety.  (*Id.*).  According to them, those factual findings concerning the circumstances they faced at the time they used force compel the conclusion that a reasonable officer could have believed that the force employed was lawful.  (*Id.*).  Defendants further argue that there was no clearly established law at the time of Matusak's arrest that required them to provide Matusak a warning and time to comply prior to deploying force.  (*Id.* at 11-13).

The established law at the time of Matusak's arrest reflected the reality that law enforcement officers respond to arrest situations, the circumstances of which are often very different one from another, in different ways – including whether they use force and, if so, the degree of the force – depending upon the circumstances they confront.  At one end of the spectrum, the law was clearly established that it is "a Fourth Amendment violation for a police officer to use significant force[,] [such as a taser,] against an arrestee who is no longer resisting and poses no threat to the safety of officers or others."  *See, e.g.*, *Jones*, 963 F.3d at 225-26 ("[after 2010] it was clearly established that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others – whether such force was by pepper spray, taser, or any other similar use of significant force – violates the Fourth Amendment"); *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) ("[o]n July 22, 2016, it was therefore clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting"); *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d at 68-69 ("[on April 30, 2013], [i]t [was] clearly established that officers may not use a taser against a compliant or non-threatening suspect"); *see also Scoma v. City of New York*, 2021 WL 230295, *12 (E.D.N.Y. 2021) ("it was clearly established [in 2010] that an officer's significant use of force against an arrestee who was no longer resisting and who posed no threat to the safety of officers or others – whether such force was by pepper spray, taser, or any other similar use of significant force – violates the Fourth Amendment") (quotation omitted).  At the other end of the spectrum, no clearly established precedent existed prohibiting an officer from using significant force against an arrestee who was resisting arrest and posing a threat to the safety of the officer or others; in fact, as the Second Circuit itself has acknowledged, precedent supported the conclusion that such force was lawful.  *Jones*, 963 F.3d

at 228 ("there was no clearly established law [in 2015] that would fairly warn police officers that a taser could not be used against a resisting arrestee[;] indeed, to the contrary, our precedents suggest that it is *not* excessive force to deploy tasers, after a warning, against arrestees who are dangerous or resisting arrest") (internal quotations omitted); *see also Vasquez v. Warren*, 630 F. Supp. 3d 524, 537 (S.D.N.Y. 2022) ("[t]he Second Circuit's precedents suggest that it is *not* excessive force to deploy tasers, after a warning, against arrestees who are dangerous or resisting arrest"); *McKnight v. Vasile*, 2017 WL 1176051, *28 (W.D.N.Y. 2017) ("where an individual is actively resisting arrest and refusing orders, and the scene presents a risk to officer safety[,] courts have granted judgment to the officers on the grounds that the use of [significant force] was not excessive or that the officers were entitled to qualified immunity") (collecting cases).

Of course, when considering the applicability of qualified immunity, "'the dispositive question is whether the violative nature of the *particular* conduct is clearly established,' and, thus, 'this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Jones*, 963 F.3d at 227 (quoting *Mullenix*, 577 U.S. at 12). As the Supreme Court has cautioned, "[s]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam).

The jury's findings and undisputed evidence in this case establish that Unterborn and Murphy responded to the scene in order to provide backup to Daminski, who they knew was attempting on his own to arrest a fleeing suspect. Nothing in the record suggests that they knew the crime for which Daminski was attempting to arrest Matusak or could be certain that he did not possess a weapon. They knew from listening to the radio transmissions that Matusak had

19

fled from Daminski and had led him on a foot pursuit. Additionally, as the jury found, Murphy

reasonably believed he had heard Daminski say that there was "fighting in the woods."

When they arrived on scene, Unterborn and Murphy each observed that Daminski

had not succeeded in restraining Matusak, and Murphy saw Matusak attempting to rise from the

ground to a standing position. As they approached, Matusak dropped to a prone position with his

hands clasped underneath his body. Each directed him to cease resisting, but Matusak continued

to resist the officers' attempts to extract his arms from underneath his body so he could be

handcuffed. Both Murphy and Unterborn reasonably believed that Matusak posed a threat to

their safety.

Although the jury determined that the particular force used by Unterborn (the

taser) and Murphy (torso strikes) was excessive under the circumstances, I cannot conclude that

no reasonable officer confronting the circumstances that Unterborn and Murphy did could have

determined that the force used to achieve the handcuffing of Matusak was lawful. As an initial

matter, Matusak's resistance permitted the officers to use some degree of force to effectuate the

arrest. *See Bradley v. Bongiovanni*, 2021 WL 3635206, *9 (W.D.N.Y. 2021) ("given

[plaintiff's] active resistance to arrest, [defendant] was permitted to use *some* degree of force to

effectuate the arrest"). Moreover, ample authority supports the conclusion that law enforcement

officers may use significant force to subdue a resisting arrestee who poses an ongoing threat.

Even assuming that the use of fist and knee strikes constitutes "significant force," *cf.*, *Rolkiewicz

v. City of New York*, 442 F. Supp. 3d 627, 644-45 (S.D.N.Y. 2020) (describing two baton strikes

delivered to overcome individual's resistance of stiffening and throwing arms to inhibit

handcuffing as "minimal force in the face of resistance to arrest"), there is no clearly established

precedent – nor, of course, was there at the time of Matusak's arrest – that prohibits the use of

20

significant force by an officer against an individual who is resisting arrest and is reasonably

believed to pose a threat to the officer's safety. *McKinney v. City of Middletown*, 49 F.4th 730,

739, 742 (2d Cir. 2022) ("the officers' incremental and combined uses of a baton, a canine, and a

taser were undertaken in response to [plaintiff's] resistance and [] once [plaintiff] finally gave up

fighting and was handcuffed and secured, the officers withdrew their force"[;] . . . [plaintiff] has

not shown that it is a violation of clearly established law for the police to ensure that a violent

suspect has been secured before *withdrawing* the significant force required to subdue the

suspect") (internal quotations omitted);[3] *Muschette ex rel. A.M.*, 910 F.3d at 71 ("we cannot say

that no reasonable officer would have believed that the use of the taser to subdue [student] was

lawful" where defendant had a reasonable basis to believe that student was ignoring directions

and posed a threat; "[w]e have repeatedly concluded . . . that it is not unreasonable for an officer

to use a taser in analogous circumstances"); *MacLeod v. Town of Brattleboro*, 548 F. App'x 6, *8

(2d Cir. 2013) (summary order) ("[defendant] used a [t]aser, once, to subdue an actively

non-compliant suspect reasonably believed to be engaged in dangerous criminal activity and who

posed a real and imminent threat to the safety of the officers and any bystanders[;] . . . it was

reasonable for [defendant] – after repeated, clear commands that [plaintiff] return to the ground –

to decide[] that using the [t]aser was required to effect the arrest"); *Maldonado v. Town of*

*Greenburgh*, 2024 WL 4336771, *21 (S.D.N.Y 2024) ("[h]ere, there was at least *some* resistance

plus an exigent situation[;] . . . [t]hat situation provided a justification for force"); *Pierce v. Town*

---

[3] Matusak mistakenly indicates that *McKinney* involved a plaintiff who had "engaged the police in a high-speed chase." (Docket # 82-8 at 15). Rather, the case involved an individual arrested after an attempted robbery. *McKinney v. City of Middletown*, 49 F.4th at 733. The force was used during a cell-extraction after the plaintiff displayed "concerning behaviors." *Id.*

Indeed, as discussed in footnotes 4, 5 and 6 *infra*, plaintiff's brief repeatedly miscites cases – both in terms of their facts and the law. The prevalence of the inaccuracies is troubling.

*of Simsbury*, 2024 WL 665917, *9 (D. Conn.) ("the recordings establish that [plaintiff] was refusing the orders to get out of the vehicle and physically resisting the officers' attempts to remove him from the vehicle before the officer used his [pepper] spray for the first time[;] . . . the officers are entitled to qualified immunity for this use of [pepper] spray"), *appeal filed*, No. 24-686 (2d Cir. 2024); *Vasquez v. Warren*, 630 F. Supp. 3d at 539 ("all reasonably competent objective officers would not agree that [defendant's] deployment of the [t]aser was unreasonable[;] . . . [d]uring the entire time leading up to deployment of the [t]aser, [p]laintiff [was] resisting arrest and clearly posing a threat to the officers and [others]"); *Scoma v. City of New York*, 2021 WL 230295 at *9 ("the undisputed facts establish that plaintiff was unrestrained, uncooperative, and reportedly had engaged in a violent domestic assault[;] . . . [those] facts establish that the taser was deployed following plaintiff's active resistance to the [defendants'] directions and his arrest"); *McKnight v. Vasile*, 2017 WL 1176051 at *28 ("where an individual is actively resisting arrest and refusing orders, and the scene presents a risk to officer safety – courts have granted judgment to the officer on the grounds that the use of pepper spray was not excessive or that the officers were entitled to qualified immunity").[4]  Another factor supporting my conclusion that a reasonable officer could have concluded that Murphy and Unterborn's responses were lawful is their knowledge that Matusak had attempted to evade Daminski's traffic stop by fleeing from him, running into a wooded area in the middle of the night, and leading him on a minutes-long chase.  *See MacLeod v. Town of Brattleboro*, 548 F. App'x at *8 n.3 ("because [plaintiff] was unsubdued and had made one clear attempt to evade arrest, the

---

[4]  Matusak maintains that *McKnight* is distinguishable because "the officer used force only after the plaintiff resisted his attempts to gain control over her for an extended period and attempted to flee" and here Matusak "surrendered" to Daminski and thereafter did not struggle or attempt to flee.  (Docket # 82-8 at 15-16). Matusak's recitation of the facts is contrary to the jury's findings that he was attempting to rise to a standing position as Murphy and Unterborn arrived and that he physically resisted their attempts to pull his arms from underneath his body.  (Docket # 69).

scope of crime in question was not simply speeding, but was unknown and potentially far more serious") (internal quotations and brackets omitted).

Indeed, in a thoughtful opinion by United States District Judge Lorna Schofield in *Harris v. Leon*, 2023 WL 2051171 (S.D.N.Y. 2023), the district court examined Second Circuit precedent between 2011 and September 2020 and concluded "there is no clearly established law that the use of significant force against a non-compliant but non-threatening arrestee amounts to constitutionally excessive force."[5] 2023 WL 2051171 at *6-7. In *Harris*, the court found that the plaintiff, who disregarded the officers' directions to back away and continued to approach a car that constituted a crime scene and moved his hands away from the officer who were attempting to restrain him, was "unrestrained and not compliant" but was "not threatening." *Id.* at *1, 7. The court determined that the defendants, including the officer who deployed his taser in response to the plaintiff's non-compliance, were entitled to qualified immunity. *Id.* Judge Schofield's analysis, as applied to this case, appears to entitle Murphy and Unterborn to qualified immunity – even if the jury's determination that they reasonably believed that Matusak posed a threat to officer safety were rejected or disregarded. That Judge Schofield found there was no clearly established law prohibiting the use of "significant force" against a non-compliant, unrestrained, but non-threatening individual is strong support for the conclusion that reasonable officers could at the very least disagree as to whether the force that Murphy and Unterborn used was constitutionally permitted. *See Brown v. City of New York*, 2016 WL 1611502, *6

---

[5]  Matusak attempts to distinguish *Harris* on the grounds that there was a large "crowd gathering," thus presenting exigent circumstances that permitted the use of a taser without warning. (Docket # 82-8 at 16). The decision, however, does not mention a "crowd," and the rationale for granting qualified immunity did not rely upon any exigencies created by a crowd. *See Harris v. Leon*, 2023 WL 2051171 at *7. Matusak also suggests this decision is contrary to Second Circuit law establishing that warnings are required because the court determined that there was no clearly established law requiring a warning before use of a taser. (Docket # 82-8 at 16). The evidence in *Harris*, however, established that the defendants had provided a warning prior to using the taser. *See Harris*, 2023 WL 2051171 at *6 ("[p]laintiff does not dispute [d]efendants' assertion that [defendant's] statement to [another defendant], 'taser, taser, taser,' was a warning").

(S.D.N.Y. 2016) ("the fact that two of four judges who reviewed this case disagreed as to whether the officers' actions constituted excessive force suggests that the right in this scenario was not clearly established") (citing *Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("[i]f judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy")), *aff'd*, 862 F.3d 182 (2d Cir. 2017).

Matusak contends that defendants' resort to significant force was clearly unlawful because he was engaged in mere passive resistance and because the officers used force against him without providing him sufficient time to comply with their orders. In advancing these arguments, Matusak both misconstrues the jury's findings and fails to identify "controlling authority or a robust consensus of cases of persuasive authority" clearly establishing the violations he alleges. *McKinney*, 49 F.4th at 738-39 (internal quotations omitted).

First, Matusak contends that the above-cited cases permitting the use of significant force are inapplicable because they turn on the arrestee's active resistance. (Docket # 82-8 at 11-19). According to Matusak, he was, at most, non-compliant or "passively" resistant, and the deputies were thus prohibited by clearly established law from using significant force against him. (*Id.*). Matusak maintains that, construing the facts in his favor, the Court must accept his testimony that, although he initially fled from Daminski, he subsequently attempted to surrender to Daminski, he never made any aggressive or violent movements towards any of the officers, and once he was "taken down" by Daminski, "the dynamic . . . changed dramatically – [he] was no longer fleeing and had assumed a defensive posture with his arms tucked underneath his body." (*Id.* at 13). In Matusak's estimation, this version of facts, coupled with the testimony by Unterborn and Murphy that they never saw him attempt to strike the officers or otherwise behave aggressively, belies any reasonable basis to believe that Matusak "presented an imminent

24

danger." (*Id.*). Rather, he merely "had his hands underneath his body and did not immediately comply with demands to reveal them." (*Id.*). Such non-compliance, Matusak continues, constitutes only "'passive' or 'defensive' resistance that can never justify an immediate resort to" significant force. (*Id.*).

The jury was not asked to make any specific factual findings concerning the physical altercation between Matusak and Daminski, and the Court, for purposes of this motion, accepts Matusak's version of the encounter where it does not conflict with the determinations and findings the jury did make. Even if the contentions that Matusak attempted to surrender and never physically attacked Daminski are credited (which seem implausible considering the jury's determination that Matusak did not establish that Daminski used excessive force against him), the relevant inquiry relating to qualified immunity for the other defendants focuses on the facts known to or reasonably believed by Unterborn and Murphy when they arrived at the scene and attempted to effectuate the arrest. *See, e.g.*, *White v. Pauly*, 580 U.S. at 76-77, 80 ("[b]ecause this case concerns the defense of qualified immunity, however, the [c]ourt considers only the facts that were knowable to the defendant officers[;] . . . [c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action . . . from assuming that proper procedures . . . have already been followed"); *see also Weilburg v. Koss*, 2024 WL 3460688, *7 n.6 (N.D.N.Y.) ("[f]or purposes of the qualified immunity analysis, only facts known to [d]efendant at the time [of the conduct] are relevant[;] . . . while the [c]ourt accepts [p]laintiff's version of the facts . . . , the [c]ourt only considers those circumstances that were knowable to [d]efendant at the time"), *appeal filed*, No. 24-2234 (2d Cir. 2024). With respect to that inquiry, the jury made several pertinent factual determinations.

As to the level of Matusak's resistance, the jury concluded that Murphy reasonably believed that he heard Daminski report that he was engaged in a fight in the woods. When he and Unterborn arrived on scene approximately 5 or 6 minutes after Daminski first reported that he was engaged in a foot pursuit, they both observed that Matusak was still unrestrained. Contrary to Matusak's version of the facts, the jury found that Murphy saw Matusak attempting to rise to his feet from the ground. Matusak thereafter not only failed to comply with commands to stop resisting and place his hands behind his back, but he physically resisted the officers' attempts to gain control of his arms by continuing to exert tension on his arms to keep them grasped under his midsection.[6]

Matusak's actions amounted to actual physical resistance and not mere non-compliance, thus distinguishing this case from the cases relied upon by Matusak. *See Bradley v. Bongiovanni*, 2021 WL 3635206 at *8, 9 (plaintiff had "actively evaded restraint, fled, and flouted commands[,] . . . [and] at the time he was pepper sprayed [plaintiff] was refusing to place his hands behind his back[;] . . . [because plaintiff] was actively resisting arrest, . . . the case law pertaining to excessive force against a compliant or non-resisting arrestee is inapplicable"). At the very least, the law was not clearly established at the time of the incident that Matusak's conduct constituted the type of resistance that rendered the use of significant force unlawful.[7] *See Maldonado v. Town of Greenburgh,* 2024 WL 4336771 at *21 (defendant

---

[6] Throughout his submission, Matusak repeatedly represents that the evidence demonstrated that he was in a fetal position when Unterborn and Murphy deployed force against him. (Docket # 82-8 at 5, 6, 11, 14). Not only is this directly contrary to the jury's findings that Matusak was face down on the ground with his hands clasped underneath his body (Docket # 69 at ¶¶ 3, 15), but many of the evidentiary citations he supplies also do not support his representation. *See* (Docket # 82-8 at 5 (citing Tr. 440), at 6 (citing Tr. 65-66 (Matusak's testimony regarding altercation with Daminski)).

[7] The question whether Unterborn's use of the taser may have been contrary to his training, which did not permit the use of a taser to overcome defensive or passive resistance (*see* Tr. 479-50), is not dispositive of the qualified immunity inquiry. *See Rose v. City of Utica*, 2018 WL 2041621, * 8 (N.D.N.Y. 2018) ("testimony concerning whether [defendant's] conduct was reasonable and conformed to professional standards of care would be

entitled to qualified immunity for use of a taser against decedent who resisted officers' attempt to pull his arm out from under his body for handcuffing; "[h]ere, there was at least *some* resistance plus an exigent situation"); *see also Scoma*, 2021 WL 230295 at *8 ("[a]lthough neither the Supreme Court nor the Second Circuit has specifically defined 'active resistance,' the Second Circuit has upheld uses of force involving tasers where the suspect was actively non-compliant with the [o]fficers' directions").

Even assuming that Matusak is correct that the facts, when viewed most favorably to him, establish that he was engaged only in passive resistance, his argument that the deputies were precluded from using significant force entirely ignores the jury's factual findings that both Murphy and Unterborn *reasonably believed* that Matusak posed a threat to officer safety at the time they deployed the challenged force. (Docket # 69 at ¶¶ 7, 11, 22). The vast majority of the cases cited by Matusak (*see* Docket # 82-8 at 7-8) do not involve circumstances in which the officers reasonably believed the arrestee posed a risk to officer safety. *See*, *e.g.*, *Benny v. City of Long Beach*, 2022 WL 2967810, *3 (E.D.N.Y. 2022) (plaintiff was arrested after failing to comply with dispersal order), *aff'd*, 2023 WL 8642853 (2d Cir. 2023) (summary order); *Soto v. Gaudett*, 862 F.3d 148, 160 (2d Cir. 2017) (defendant's arguments failed to acknowledge plaintiff's view that at the moment the taser was deployed he "was neither threatening nor fleeing" and the testimony suggesting that plaintiff "had become both incapacitated and compliant"); *Tracy v. Freshwater*, 623 F.3d 90, 99 (2d Cir. 2010) (issue of fact whether plaintiff was already in handcuffs when pepper spray was deployed precluded summary judgment on

---

relevant to determining whether [defendant] used excessive force[,] . . . but it has no bearing on whether it was clearly established at the time that the conduct at issue violated the law"), *aff'd*, 777 F. App'x 575 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1119 (2020); *see also Brown v. City of New York*, 862 F.3d 182, 192 (2d Cir. 2017) (construing the disputed fact concerning defendant's violation of police department directive in plaintiff's favor "does not change [the] conclusion; [plaintiff] is unable to demonstrate that [the conduct] violated 'clearly established' Fourth Amendment law against excessive force").

qualified immunity); *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 723 (S.D.N.Y. 2015) (denying motion to dismiss on grounds of qualified immunity; "[n]othing in the complaint suggests that [plaintiff] posed a safety threat to the officers . . . [or] indicates that he was actively resisting arrest"); *Ragland v. City of Mt. Vernon*, 2013 WL 4038616, *1, 6-7 (S.D.N.Y. 2013) (disputed facts precluded summary judgment on qualified immunity where plaintiff testified that he did not resist arrest and did know he was being arrested until after force was deployed). Moreover, one of the few that does resulted in qualified immunity for the defendant officer. *See Muschette ex rel. A.M.*, 910 F.3d at 70 (granting qualified immunity to officer for use of taser where officer reasonably believed plaintiff posed a threat to himself or others and had a reasonable basis to believe that his instructions and warning were conveyed to plaintiff).

Persuasive authority establishes that the use of significant force is permissible where an individual poses a safety risk to the officers or others. *See MacLeod*, 548 F. App'x at 8 (use of taser reasonable to "subdue an actively non-compliant suspect . . . who posed a real and imminent threat to the safety of the officers and any bystanders"); *McKnight*, 2017 WL 1176051 at *27 (officer entitled to qualified immunity where he deployed pepper spray "after he failed to gain control of [plaintiff] and . . . she turned toward him and he felt vulnerable to a physical threat, such as a punch"); *see also Ramos v. Town of E. Hartford*, 2019 WL 2785594, *7 (D. Conn. 2019) ("courts have held it appropriate to deploy pepper spray when necessary to eliminate the risk of harm"). Matusak maintains that these cases are distinguishable because they involved circumstances in which the arrestee "indisputably posed an immediate danger." (Docket # 82-8 at 18). Although the jury found that Matusak did not actually pose a threat to officer safety when Murphy and Unterborn used force against him, it specifically found that they reasonably believed he did. Matusak has failed to adduce authority for the proposition that resort

to significant force is prohibited when officers reasonably but mistakenly believe that the arrestee poses a threat to officer safety. *See Kisela v. Hughes*, 584 U.S. 100 at 106 ("[t]here, as here, the police believed (perhaps mistakenly) that the man posed an immediate threat to others"); *Jones*, 963 F.3d 214 at 232 ("the reasonableness of a particular mistake of fact may dictate whether any reasonable officer would have understood that his conduct was unlawful"); *Tracy v. Freshwater*, 623 F.3d 90 at 97 ("our focus is not on [plaintiff's] motivations but instead on the sequence of events from the perspective of a reasonable officer at the scene[;] [i]n finding that such an officer would reasonably have construed [plaintiff's] conduct as intentional and threatening, we emphasize that the events in question took place at night . . . [and involved] a close-quarters, hand-to-hand struggle").

          For similar reasons, I reject Matusak's argument that clearly established authority prohibited defendants from using significant force without providing him with a warning and opportunity to comply. *See McKinney*, 49 F.4th at 741 ("[i]n light of the threat [plaintiff] posed, it would not have been clear to a reasonable officer that deploying [significant force] without first providing a warning was unlawful in the situation the officers confronted") (internal quotations and brackets omitted). The cases cited by Matusak either do not stand for the proposition for which he cites them, *see Muschette ex rel. A.M.*, 910 F.3d at 71 (granting summary judgment to officer where plaintiff was warned and where he posed a safety risk); *Soto v. Gaudett*, 862 F.3d at 148 (case does not involve or discuss warnings);[8] *Tracy*, 623 F.3d at

---

[8] Matusak cites this case several times in his submission for the proposition that officers are not entitled to qualified immunity where they failed to warn prior to the use of force. (Docket # 82-8 at 8, 13, 14). To the contrary, *Soto* contains no discussion concerning warnings, and the alleged quotations in Matusak's brief are not in the decision. Additionally, *Soto* did not involve the use of pepper spray as plaintiff states (*see* Docket # 82-8 at 8), but the use of a taser. *Soto*, 862 F.3d at 153. Moreover, *Soto* and *Jones* – a more recent Second Circuit case involving the use of a taser – are factually distinguishable from this case because both cases involved multiple taser deployments, *see Jones*, 963 F.3d at 220, and *Soto*, 862 F.3d at 160, while in this case the testimony established that Unterborn only deployed the taser for a single, five-second cycle (Tr. 452-57).

98-99 (case does not involve or discuss warnings); *Gersbacher v. City of New York*, 134 F. Supp. 3d at 723 (case does not involve or discuss warnings), or are distinguishable because they involved non-threatening and non-resisting arrestees, *Benny v. City of Long Beach*, 2023 WL 8642853 at *2 (accepting plaintiff's allegations as true, district court properly applied caselaw dealing with non-resisting individuals); *Ragland v. City of Mt. Vernon*, 2013 WL 4038616 at *1 (plaintiff testified that he did not resist arrest and that force was used without defendants advising him that he was under arrest).

        In any event, the jury determined that both Unterborn and Murphy provided verbal commands to Matusak prior to each application of force. (Docket # 69 at ¶¶ 4, 8, 18). Although the jury determined that the officers did not provide Matusak sufficient time to comply with the commands prior to deploying force against him (Docket # 82-8 at 7-9),[9] plaintiff fails to cite any cases, much less "a robust consensus of cases of persuasive authority," clearly establishing that officers faced with similar circumstances are required not only to warn a resisting suspect but also to delay the use of force for some period of time in order to determine whether the suspect will comply with their commands.[10] *See McKinney*, 49 F.4th at 740, 741 ("deploying [significant force] may be objectively reasonable, even without a warning, when there is an immediate threat to the safety of officers and the community") (internal quotations omitted); *Vasquez*, 630 F. Supp. 3d at 537 ("cases within this Circuit have acknowledged that

---

[9] The questions addressing whether the defendants provided Matusak sufficient time to comply with the defendants' directions prior to using force were included in the Special Interrogatories at plaintiff's request without objection by defendants. (Tr. 708-09).

[10] Matusak does not argue (or provide any precedent establishing) that Unterborn was required to delay the deployment of his taser until he ascertained whether Matusak would comply with Murphy's torso strikes. Although the evidence established that Murphy deployed the torso strikes prior to Unterborn's deployment of the taser, the evidence showed that both officers were responding to a fluid situation at approximately the same time, and the jury determined that Unterborn did not see Murphy's torso strikes prior to deploying the taser. (Docket # 69 at ¶¶ 16-17).

when a conflict evolves unexpectedly and rapidly, a warning is not feasible[;] . . . [t]hus, where a plaintiff precipitates an unexpected physical altercation and is resisting arrest and fighting the officers, a warning is likely not feasible, but even if it were, in the absence of clearly established law requiring a warning, an officer's failure to warn before deploying the [t]aser does not deprive him of qualified immunity for the otherwise reasonable use of a [t]aser against an actively noncompliant suspect") (internal quotations and brackets omitted); *Ramos v. Town of E. Hartford*, 2019 WL 2785594 at *10 ("even if [defendant] did not warn [plaintiff], it was reasonable under these circumstances because the fight evolved unexpectedly and rapidly, and a warning was not feasible").

       "Certainly, the ideal encounter between law enforcement officers and civilians is one that involves the least invasive measures possible to obtain compliance from arrestees." *McKnight*, 2017 WL 1176051 at *26. Nevertheless, it is well-recognized that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving," *Jones*, 963 F.3d at 235-36, and "the Fourth Amendment does not mandate that an officer's actions conform to a standard of perfection or even best possible police practices; rather it requires nothing more or less than reasonableness," *McKnight*, 2017 WL 1176051 at *26. In this case, I cannot conclude that under the circumstances Murphy and Unterborn confronted – which included another officer's inability to restrain and arrest an individual who had fled the officer, led him on a several-minutes-long foot chase through the woods in the middle of the night, continued to resist arrest by physically trying to get up and then by lying on his arms and grasping them underneath his body to avoid handcuffing, and who may have had a weapon – it would have been clear to every reasonable officer that Murphy's and Unterborn's decision to apply the force that they did was unlawful. Because reasonable officers could

disagree as to whether the force used by Murphy and Unterborn was constitutionally excessive, I find that defendants Murphy and Unterborn are entitled to qualified immunity on Matusak's Section 1983 claim for excessive use of force.

## <u>CONCLUSION</u>

For the reasons stated above, the motions by Murphy and Unterborn for judgment in their favor on the grounds of qualified immunity **(Docket # 77)** are **GRANTED**.  Judgment shall be awarded in favor of Daminski, Murphy, and Unterborn on Matusak's claims against them.  The Clerk of the Court is hereby directed to enter judgment accordingly.  Because I have determined that defendants are entitled to judgment in their favor, Matusak's motion for pre-judgment and post-judgment interest **(Docket # 79)** is hereby **DENIED**.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        November 1, 2024